Filed 2/25/21  P. v. Ibarra CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C085703 |
| Plaintiff and Respondent, | (Super. Ct. No. STKCRFECOD20150007170) |
| v. | |
| GUILLERMO IVAN IBARRA, | |
| Defendant and Appellant. | |

Defendant Guillermo Ivan Ibarra appeals from his conviction of first degree murder as an aider and abettor and aggravated assault.  He contends (1) insufficient evidence supports his murder conviction; (2) the trial court erred by not instructing on the lesser included offense of involuntary manslaughter; (3) the trial court erred by admitting evidence of an uncharged prior shooting which defendant witnessed and his codefendant committed; and (4) cumulative error.

We affirm the judgment.

FACTS AND PROCEDURAL HISTORY

*Murder of Jovanny Moran*

Rogelio Gonzalez and Jovanny Moran were friends in 2015. (Gonzalez was also known as Junior and Clumsy.) Occasionally, Moran would stay at Gonzalez's house and sleep on a couch outside. They worked together in the fields.

During 2015, Gonzalez smoked methamphetamine. He had done so for a long time and he would use just enough to make him feel good. The methamphetamine gave him energy, but never made him act like a wild person.

Gonzalez would visit a slough near his home on his own and he and Moran would also have to go into the slough and under some bridges to get to work. A number of people lived at the slough. Gonzalez would regularly see defendant and codefendant Juan Carlos Villalpando-Lua at the slough. He knew them; they were not homeless. (The parties refer to Villalpando-Lua as Carlos.)

When Gonzalez gets nervous, he stutters. It makes it hard for him to explain himself. He did not want to talk about Moran's death at trial because Moran had been a good friend. On occasion, Moran had helped Gonzalez talk to people. Asked if he knew defendant, Gonzalez said it was difficult to talk because, "I don't want to be a snitch. I don't want to be named as something I'm not."

Gonzalez bought a bicycle for $10. On July 29, 2015, Carlos accused Gonzalez of stealing the bike. Carlos claimed the bike belonged to his friend, defendant. Gonzalez explained he did not steal the bike. Moran defended Gonzalez, telling Carlos that Gonzalez had done nothing. Gonzalez believed that Carlos thought Moran was interfering in Carlos's business and thought it disrespectful. The argument ended, and Gonzalez and Carlos split up.

After the argument, Gonzalez and Moran walked to a nearby liquor store. It was nighttime. Gonzalez purchased some cigarettes, and the pair walked back to the slough.

Upon returning, they saw Carlos and defendant run up a hill toward them. Each of them had a gun. Carlos held a shotgun and pointed it at Moran and defendant held a handgun.

Carlos said, "Who's tripping now." Gonzalez responded, "No, no one." Moran told Carlos to stop and stood in front of Gonzalez to defend him. Carlos shot Moran once at very close range in the stomach. Moran fell to the ground. Gonzalez held Moran in his arms and told him to say alive. There was blood on Moran's stomach and his intestines were protruding.

Gonzalez ran to his home and told his mother what had happened. His sister-in-law called the police, and Gonzalez ran back to Moran to see if he was alive. He was not. Police arrived, and Gonzalez explained who Moran was and who had shot him. Worried about who Gonzalez was, the police placed him in the back of a patrol car. They released him after a short while. While in the patrol car, Gonzalez told the officer that defendant had held a long-barreled revolver.

Later, Gonzalez met with detectives at the police station. He explained what had happened and told them who shot Moran. Identifying the defendants upset Gonzalez for fear of being called a snitch, and he worried about problems it could cause his family. He identified Carlos from a photo as the shooter and defendant from a photo as the other person who had been with Carlos at the time of the shooting.

Carlos Posadas lived at the slough under a tunnel. He knew Moran and Gonzalez. Posadas was arrested the night of the shooting for trespassing. The following day, Detective Hector Alaniz asked Posadas, who was still in custody, if he knew what happened to Moran. Posadas said he had seen Carlos earlier that night in the tunnel with a gun. Posadas was coming out of the tunnel when Carlos arrived with another person. Posadas heard Carlos say that if anyone "starts acting like a dumb shit or stupid shit, they're going to go down." Posadas could see only Carlos clearly, and Carlos was carrying a gun.

Detective Alaniz visited Posadas after Posadas was released from jail. Posadas identified Carlos in a photographic lineup as the person he saw with a gun the night Moran was killed. Posadas said that everyone would call Carlos "Carlitos," and that he feared Carlos. Posadas again told Detective Alaniz that before police arrived in the area the night of the shooting, he saw Carlos walking around with a weapon.

Detective Alaniz testified that when he first met with Posadas, Posadas said he had seen Carlos the night of the murder carrying a firearm. The detective showed Posadas his side arm, a .40 caliber handgun, and asked if the gun Posadas saw was similar. Posadas said the one he saw was longer and could have been a rifle. He held his hands apart by about a foot and a half to indicate the gun's size. Posadas said that Carlos was holding the gun down to his side.

Posadas told Detective Alaniz that he saw Carlos in the slough often, and he provided a physical description of him. Carlos usually rode a 20-inch bike when he went into the slough. Detective Alaniz did not ask Posadas if he knew defendant or show him a picture of defendant. At that time, the detective was not familiar with any other person of interest.

Moran died of a shotgun blast to the abdomen from about three feet away. If the shotgun was a sawed-off shotgun, it would have been slightly closer to the victim. The blast was so close it left powder stippling on Moran's cheek and pieces of wadding in his abdomen.

*Shooting of Angel Torres*

The prosecution introduced evidence of an uncharged act--the shooting of Angel Torres by Carlos--to establish defendant's knowledge at the time of Moran's murder. In April 2015, approximately three months before Moran was killed, Manuel Ocampo and Joaquin Ibecdarros were living in a lot near the slough. Ocampo had a barbeque for cooking food. A woman and the woman's boyfriend, a man named Marcos, lived next to

4

a building on the other side of a fence from Ocampo and Ibecdarros. Removing some of the fence's boards allowed access to either side.

On the evening of April 12, 2015, Marcos, his girlfriend, and another man were cooking on Ocampo's barbeque. The other man was Angel Torres. He visited the couple every week, and Ocampo got to know him. While the others cooked, Ocampo was watering trees in the front of the lot when Ibecdarros called him to come and see a group of people arguing by the nearby railroad tracks. Ocampo went and stood on a mound of material to see over a fence toward the tracks. He saw the individuals arguing by the tracks, and he recognized one of them as Rogelio Gonzalez, the same Gonzalez who witnessed Moran's murder. Gonzalez lived one or two blocks away and was always around there.

After viewing the argument for a few seconds, Ocampo went back to Ibecdarros. The couple and Torres were no longer at the barbeque. Ocampo told Ibecdarros not to worry; the argument had nothing to do with them. He went back to water the trees, and as he grabbed the hose, he heard a shot come from where he had seen the argument. He and Ibecdarros hit the ground. He got up and looked over the fence. He saw Marcos holding Torres in his arms. None of the people who had been arguing were still there.

Gonzalez testified about this shooting as well. He said he was walking near the railroad tracks when he saw Carlos, defendant, and one other person by a building. He heard an argument, then a shot fired, and he kept walking. He walked faster so it would not happen to him. He did not see anyone do anything to the third person or take out a knife or weapon. He did not remember telling police that the third person pulled out a knife and tried to slash Carlos.

After the shooting at the railroad tracks, Carlos beat up Gonzalez and told him not to say anything. That made Gonzalez worried about having to come to court.

Following his arrest, defendant was interviewed by police. In the interview, he admitted being present when Carlos shot Torres. They were having an argument, and

5

Carlos shot Torres in the face. After the shooting, defendant and Carlos ran toward the slough and split up. (Mr. Torres died from his injury, but the trial court did not allow the prosecution to present the fact of his death to the jury pursuant to Evidence Code section 352.)

*Assault of Juan Lopez*

Juan Lopez lived and worked at his sister and brother-in-law's mechanic shop. In 2015, he used methamphetamine every day. He no longer used the drug at the time of trial.

On July 28, 2015, while walking back to the shop, Lopez saw Carlos, defendant, and another person known as Simon riding bikes toward him. A few days earlier, defendant had disrespected Lopez by calling him a bitch, so Lopez had called defendant a bitch. As the three pulled up, Lopez thought whatever would happen would be between just he and defendant, as his "beef" was with defendant. Lopez asked Carlos if they were going to jump him, but Carlos did not respond.

Lopez went into the mechanic shop's lot through a broken section of a gate. The other three followed him. Defendant broke a bottle over Lopez's head. Lopez backed up and looked for something to pick up to use to defend himself. One of the men grabbed him in a bear hug and the other two pounded on him. Lopez fell to his knees and tried to cover his head as the men hit and kicked him. All three men participated in the attack.

Lopez did not know how the attack ended; he just remembered the men leaving. He was bleeding a lot. He walked out intending to go to his friend's house, but he collapsed.

That night, Alyssa Caitlin Murphy and her friend were driving through the area when they heard a noise that sounded like a dog wailing. As they listened more, they recognized the sound as a voice. The person was saying, "Help." Murphy called 911.

6

She saw shadowy figures running. It looked like two or three people were beating someone up.

Police arrived at approximately 10:35 p.m. They found Lopez lying on the sidewalk holding his head and bleeding. He had a large gash in his head. Lopez gave police the names and descriptions of his three attackers. Doctors at the hospital found a laceration on Lopez's head and on his wrist. They closed the head laceration with staples. Lopez struggled with talking and slurring for months after the attack. He still gets migraines and sometimes catches himself slurring, conditions he did not have before the attack.

*Statements to police and the investigation*

Officers arrested defendant and Carlos on July 31, 2015. They interviewed defendant regarding the Lopez assault, the Moran murder, and the Torres shooting. The interview was recorded and played for the jury. At the time of the interview, defendant was 26 years old. Carlos was 19. Defendant had known Carlos since Carlos was 10 years old. Carlos was like a little brother, and defendant had always tried to look after him.

Defendant said he was always at the slough. He would go to "haunt" and scare the people there. The people thought he was a shadow. He would play loud music and scare them. Carlos sold drugs there. If the buyers did not pay him, he would fight them.

Defendant admitted his involvement in the Lopez assault. He hit Lopez on the head with a bottle, and the other two people jumped in to help. He was the only person to use a weapon.

Defendant also discussed his involvement in the Moran murder. He did not know Moran. Carlos had an argument with Moran earlier. He called defendant and said he was looking for "this guy." He said he needed the "thing," referring to the shotgun.

7

Defendant had bought the shotgun from someone in the slough a couple of weeks before. Counsel for both sides referred to the gun as a sawed-off shotgun without objection.

Carlos came to defendant's house around 10:00 p.m. Defendant gave him the shotgun and some ammunition, and then he went with him. They walked to the slough. Carlos said Clumsy (Gonzalez) would be with the guy. Defendant told the officers he was not looking for Moran or Gonzalez; he went with Carlos because he didn't want to "see something bad happen to [him] either."

Carlos and defendant found Gonzalez and Moran right away and ran to them. Carlos and Moran started arguing. Carlos raised the shotgun and shot Moran in the stomach. After Moran fell, Carlos and defendant ran toward the slough and split up. Carlos brought the gun back to defendant's home later that day. The two did not talk about the shooting that day, and defendant did not ask Carlos any questions about it afterward. Defendant told the interviewing officers they could find the gun at his home on top of his bed.

The interview turned to the Torres shooting. Defendant had seen Carlos with handguns before. That day, he and Carlos were not looking for anyone. There was an altercation between Carlos and Torres, and Carlos shot Torres once in the face. After the shooting, Carlos and defendant ran toward the slough and split up.

Defendant elaborated on the incident. He and Carlos were walking toward two guys who were going to fight, and then Torres came out of nowhere and yelled at the group. Carlos and Torres said things to each other, and then Carlos shot him. Afterward, Carlos told defendant he was stabbed in the altercation. Defendant saw the wound.

After the police interviewed defendant and Carlos, they put them in a room together. Their conversation was recorded, and excerpts were played to the jury. The two men compared what they had said in their interviews. Both had told their interviewers that the gun was theirs. Defendant said he told the police that Carlos shot Torres because Torres stabbed him. Both men complained about snitches at the slough,

8

especially Clumsy (Gonzalez) and Guerro (Lopez). Carlos said, "[T]he one that their doing more is me 'cause I'm the one that pulled the trigger." He told defendant not to "trip" because he (defendant) would be out. Carlos hoped they did not get defendant as an accomplice; that was why he told the interviewer that defendant was not there.

Police reviewed text messages from defendant's cell phone. Within a day of the Lopez assault, defendant had texted a woman informing her he had beaten Lopez for her. When the woman asked why, defendant wrote back that she had told him to do it. In another series of texts, defendant told the recipient to tell Gonzalez to be quiet, and that the recipient should know better than to do things around snitches.

Police searched defendant's home. They found a paper with defendant's name and the home's address on it. They found the shotgun defendant said had been used in Moran's murder on defendant's bed. The gun was inside a green bag and was loaded with two shells. Police found a small bag of bullets of various calibers on top of a dresser in the bedroom. They also found ammunition for a rifle in a second bedroom.

*Verdict and sentence*

Defendant and Carlos were tried together with separate juries. The jury found defendant guilty of first degree willful, premeditated and deliberate murder of Moran and the assault of Lopez with force likely to produce great bodily injury. (Pen. Code, §§ 187, subd. (a); 245, subd. (a)(4); statutory section references that follow are to the Penal Code unless otherwise stated.) The jury also found true as an enhancement to the murder count that defendant was a principal and that a principal was armed with a firearm. (§ 12022, subd. (a)(1).)

The trial court sentenced defendant to a prison term of three years plus 26 years to life, calculated as follows: 25 years to life for the murder plus a consecutive one year for the enhancement, and a consecutive three years (the mid term) for the assault.

9

Before us, as earlier noted, defendant contends (1) insufficient evidence supports his first degree murder conviction as an aider and abettor; (2) the trial court erred by not instructing on the lesser included offense of involuntary manslaughter; (3) the trial court erred by admitting evidence of the Torres shooting under Evidence Code section 1101, subdivision (b) to establish his knowledge of Carlos's intent at the time of the murder; and (4) cumulative error.

I

*Substantial Evidence Supports Defendant's Murder Conviction*

Defendant contends that no substantial evidence supports his conviction of premediated murder. He was prosecuted on a direct aiding and abetting theory. He claims there is no evidence establishing two elements of aiding and abetting: intent to aid a premeditated murder and knowledge of Carlos's intent to murder. He asserts that at most, the evidence supports a conviction of aiding and abetting an assault with a firearm. These contentions fail.

" 'When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Elliott* (2012) 53 Cal.4th 535, 585 [].) Our review must ' "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." ' (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) Even where . . . the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might ' " 'be reasonably reconciled with the defendant's innocence.' " ' (*Id*. at p. 92; see *People v. Maury* (2003) 30 Cal.4th 342, 403 [(*Maury*)].) The relevant inquiry is whether,

10

in light of all the evidence, a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Towler* (1982) 31 Cal.3d 105, 117-118.)" (*People v. Gomez* (2018) 6 Cal.5th 243, 278.)

To convict defendant as an aider and abettor to premediated murder, the prosecution had to establish that defendant (1) knew that Carlos intended to murder Moran; (2) intended to aid Carlos in committing the murder; and (3) intentionally aided in the commission of the murder.

"Aiders and abettors may still be convicted of first degree premeditated murder based on direct aiding and abetting principles. ([*People v.*] *McCoy* [(2001)] 25 Cal.4th 1111, 1117-1118.) Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission. (*Id.* at p. 1118.) Because the mental state component-- consisting of intent and knowledge--extends to the entire crime, it preserves the distinction between assisting the predicate crime of second degree murder and assisting the greater offense of first degree premeditated murder. (*McCoy, supra,* 25 Cal.4th at p. 1118 ['an aider and abettor's mental state must be at least that required of the direct perpetrator']; cf. *Rosemond v. United States* (2014) 572 U.S. [65, 76] [188 L.Ed.2d 248.) An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*People v. Chiu* (2014) 59 Cal.4th 155, 166-167.)

"Even if someone else pulled the trigger, as long as [the defendant] 'aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission,' he is guilty of murder; if he did so 'willfully, deliberately, and with

premeditation,' that murder is of the first degree. (*People v. Chiu,* [*supra,*] 59 Cal.4th 155, 167 [].)" (*People v. Lara* (2017) 9 Cal.App.5th 296, 318.)

Evidence supporting a finding of premeditation and deliberation generally falls into three categories: (1) planning activities, (2) motive, and (3) manner of killing. (*People v. Perez* (1992) 2 Cal.4th 1117, 1125; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) "Analysis of the cases will show that [the California Supreme Court] sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Id.* at p. 27.)

There is sufficient credible evidence in the record of planning, motive, and manner of killing from which a reasonable jury could find beyond a reasonable doubt that defendant aided and abetted Carlos in the murder of Moran, and specifically that he knew Carlos intended to kill and he shared that intent.

Defendant knew Carlos well. He had known Carlos for at least nine years and viewed him as a little brother. Defendant always tried to look after Carlos. And when Carlos contacted defendant and asked for the shotgun, defendant already knew that Carlos had killed someone in an argument by using a gun. He had watched as Carlos shot Torres in the face over an argument.

On the day of the murder, Carlos contacted defendant. He told defendant he was looking for someone he had argued with and he needed the shotgun. Defendant gave Carlos the shotgun and some ammunition, and then he accompanied defendant to the slough. Most significantly, defendant carried his own handgun to the slough.

When they arrived, Carlos told defendant that if anyone "starts acting like a dumb shit or stupid shit, they're going to go down." Upon hearing Carlos's express intent, defendant did not change course. When he and Carlos ran up to Moran and Gonzalez, defendant held his handgun in view of Gonzalez. Defendant said, "who's tripping now," and as Moran responded, Carlos shot him. After Moran fell, he and Carlos ran and split

12

up.  Carlos brought the gun back to defendant's home later that day.  The two did not discuss the shooting, and defendant afterward did not ask Carlos any questions about it.

In short, defendant knew that Carlos intended to look for a man with whom he had argued and to use the shotgun to solve the argument.  Defendant had seen just three months earlier how Carlos solved an argument with a gun by shooting the opponent in the face, an obvious display of intent to kill.  With this knowledge of Carlos's intention, defendant gave Carlos not only the gun but also ammunition, thereby ensuring that Carlos could act on his intent to kill.  Moreover, defendant went with Carlos to solve the argument, carrying his own gun.  On their way and before meeting up with Moran, Carlos told defendant that anyone who acted "like a dumb shit or stupid shit" was "going to go down."  At this point, defendant knew that Carlos was pursuing his cause with the intent to kill, and defendant continued on with him.  Afterward, the two did not discuss the killing.  The jury could infer from this fact that the two did not discuss the murder because defendant knew Carlos so well and the killing had not been a surprise.

Thus, there was planning and motive, and the manner of killing showed that Carlos intentionally killed Moran according to a preconceived design.  Defendant participated in the planning and shared Carlos's motive and intent.  From these facts, the jury could infer beyond a reasonable doubt that defendant knew Carlos intended to kill, defendant intended to facilitate Carlos in that killing, and defendant in fact did facilitate the killing by providing the murder weapon and ammunition.  Substantial evidence supports the conviction of first-degree murder as an aider and abettor.

II

*Not Instructing on Involuntary Manslaughter*

Defendant contends the trial court erred when it did not on its own initiative instruct the jury on the lesser included offense of involuntary manslaughter.  He claims substantial evidence supported giving the instruction.  He argues that without the

13

instruction, the court gave the jury a choice only between convicting him of first-degree murder or acquittal (even though the court also instructed on second-degree murder), and the jury, convinced of his culpability of committing some type of offense but not convinced he had the intent to kill, likely balked at acquitting him of murder. We hold the court did not err.

## A.    Invited Error

Initially, the Attorney General claims defendant has forfeited this argument because he invited any error the court may have committed by not instructing on involuntary manslaughter. We disagree.

### 1.    Background

When the court and the parties were considering CALCRIM No. 252, an instruction on specific intent, the court raised the issue of whether to instruct on voluntary and involuntary manslaughter as lesser included offenses of murder. The discussion went as follows:

"THE COURT: So, let's see. We'll go to voluntary manslaughter here. So are you seeking voluntary manslaughter, Mr. Jacobsen [defense counsel]?

"MR. JACOBSEN: Um.

"THE COURT: And then how would we get there, would be the next question.

"MR. JACOBSEN: Yes. I'm –

"THE COURT: I guess I'm kind of stymied. I'm not sure how you get there with regards to . . . [defendant], excuse me –

"MR. JACOBSEN: No. It's very difficult for –

"THE COURT: On an aiding and abetting.

"MR. JACOBSEN: On an aider and abettor to have a manslaughter."

After more discussion, the dialogue continued:

"THE COURT: I think -- I don't think you're going to be able to get to voluntary.

14

"MR. JACOBSEN:  I don't believe I'll be arguing it, Judge.

"THE COURT:  Especially on the facts of this case.  [Defendant] wasn't present for the first argument, at least that's how the evidence has come out.  And on the second argument, one can even debate whether -- Well, I don't even know if there was a second argument.  Mr. Villalpando [Carlos] was talking and shooting, so I guess that would be something you'd argue.  But either way, [defendant] wasn't involved in any argument.  So I'm going to remove the voluntary and then that follows involuntary, of course, also."  Defense counsel did not object.

As a result, the court determined not to instruct the jury using CALCRIM Nos. 570 and 580, the instructions, respectively, for the lesser included offenses of voluntary manslaughter based on heat of passion and involuntary manslaughter.  Defense counsel did not object to these actions.

As the parties continued going through the proposed instructions, the court without objection removed all references to voluntary and involuntary manslaughter in other proposed instructions because it was not going to instruct on those lesser offenses.

2.    Analysis

A claim of error based on the trial court's not instructing on a lesser included offense on its own initiative "may be waived under the doctrine of invited error if trial counsel both ' "intentionally caused the trial court to err" ' and clearly did so for tactical reasons.  ([*People v*.] *Coffman* [*and Marlow* (2004)] 34 Cal.4th [1], 49.)  Invited error will be found, however, only if counsel expresses a deliberate tactical purpose in resisting or acceding to the complained-of instruction.  (*People v. Cooper* (1991) 53 Cal.3d 771, 830; *People v. Wickersham* (1982) 32 Cal.3d 307, 332, disapproved on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 201.)"  (*People v. Souza* (2012) 54 Cal.4th 90, 114.)

Even where defense counsel expressly withdraws a request for an instruction and declares doing so for a tactical reason, if "counsel's choice appears to have been the product of the trial court's earlier ruling, it may be questionable to impose this procedural bar if counsel merely acted defensively and reasonably in direct response to the court's earlier ruling . . . ." (*People v. Souza, supra*, 54 Cal.4th at p. 115.)

Defendant did not invite the error. There is no evidence that defense counsel intentionally caused the court to err. Agreeing to the court's statement is not the equivalent of intentionally causing it or acceding to it for a tactical purpose. The trial court did not explain why it believed no evidence supported an instruction on involuntary manslaughter. It seemed to believe that the lack of evidence to support an instruction on voluntary manslaughter precluded an instruction on involuntary manslaughter. Counsel did not make that argument, but neither did he intentionally cause the court to reach that conclusion. At most, counsel acquiesced in the court's determination without expressing a deliberate tactical reason for doing so. And counsel's subsequent acquiescence to the court's redaction of involuntary manslaughter from other instructions appears to have been in response to the trial court's earlier rulings. Under these facts, we cannot say defense counsel caused the trial court to err.

B.     Relevant law

" '[A] trial court must give " ' "instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." ' " [Citation.] "As our prior decisions explain, the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of

16

reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." [Citation.]' (*People v. Romero* (2008) 44 Cal.4th 386, 402-403].)" (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 477.)

"Speculation is insufficient to require the giving of an instruction on a lesser included offense." (*People v. Mendoza* (2000) 24 Cal.4th 130, 174.) "[T]he trial court need not, even if requested, instruct the jury on the existence and definition of a lesser and included offense if the evidence was such that the defendant, if guilty at all, was guilty of the greater offense." (*People v. Kelly* (1990) 51 Cal.3d 931, 959.)

We review claims concerning a trial court's not instructing on a lesser included offense de novo, considering the evidence in the light most favorable to the defendant. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30 (*Brothers*).)

Involuntary manslaughter is a lesser included offense of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) It is the unlawful killing of a human being without malice. (§ 192.) In other words, it is " 'the unlawful killing of a human being in certain unlawful ways without any intention of doing so.' (*People v. McManis* (1954) 122 Cal.App.2d 891, 898.)" (*People v. Burroughs* (1984) 35 Cal.3d 824, 834 (*Burroughs*), disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 89.) Section 192, subdivision (b) defines involuntary manslaughter as a killing, without malice, "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."

Under section 192 and case law, a homicide may constitute involuntary manslaughter when the defendant without malice kills the victim during the criminally negligent commission of the following acts:

(1) A misdemeanor (§ 192, subd. (b); *People v. Cox* (2000) 23 Cal.4th 665, 675);

(2) A lawful act (§ 192, subd. (b); *People v. Luo* (2017) 16 Cal.App.5th 663, 670);

17

(3) A noninherently dangerous felony (*Burroughs, supra*, 35 Cal.3d at p. 835); and

(4) An inherently dangerous assaultive felony (*Brothers, supra*, 236 Cal.App.4th at pp. 33-34).

The third and fourth types of involuntary manslaughter arise out of the California Supreme Court's interpretation and limitation of the felony murder rule. We will explain below.

Defendant contends substantial evidence supported instructing on involuntary manslaughter based on Moran being killed without malice and in the criminally negligent commission of (1) the noninherently dangerous felony of unlawful possession of a sawed-off shotgun; (2) an inherently dangerous assaultive felony; and (3) a felonious assault. We review each theory.

C.    Noninherently dangerous felony

Initially, we explain how a noninherently dangerous felony became a predicate act for involuntary manslaughter. In *Burroughs*, the California Supreme Court interpreted the legislative intent behind section 192, subdivision (b), the involuntary manslaughter statute, to require that when a defendant without malice but with criminal negligence kills someone during the commission of a noninherently dangerous felony, the crime is involuntary manslaughter. (*Burroughs, supra*, 35 Cal.3d at pp. 835-836.)

In *Burroughs*, the defendant, who was not a physician, administered deep abdominal massage to the victim as treatment for terminal leukemia. The defendant claimed the massages and other remedies would cure the illness. Instead, the treatments exacerbated the victim's condition and he died. The jury convicted the defendant of second degree felony murder, concluding defendant committed the homicide while engaged in the unlicensed practice of medicine, a felony under Business and Professions Code section 2053. (*Id*. at pp. 827-828.)

18

The California Supreme Court reversed the conviction. The felony murder rule applied when the defendant caused a death while committing a felony which was inherently dangerous to human life. (*Burroughs, supra*, 35 Cal.3d at pp. 829-830.) The rule imputed malice where none may have existed in order to encourage potential felons to commit their offenses without perpetrating unnecessary violence which could result in a homicide. (*Id*. at pp. 829, fn. 3, 833.) But the felony murder rule applied only to killings occurring in felonies that were inherently dangerous to human life; otherwise, the rule would apply too broadly without deterring the potential felon. (*Id*. at p. 829.) To determine whether a felony was inherently dangerous, the court looked to the offense's elements in the abstract, not the particular facts. (*Id*. at pp. 829-830.) It determined the offense of practicing medicine without a license was not an inherently dangerous felony, and thus concluded the defendant could not be convicted of second degree felony murder. (*Id*. at pp. 832-833.)

Of relevance here, the *Burroughs* court also held that the trial court erred by not instructing on a different type of nonmalice murder, that of involuntary manslaughter. (*Burroughs, supra*, 35 Cal.3d at p. 834.) The court acknowledged that a killing in the course of a noninherently dangerous felony was not expressly within section 192's definition of involuntary manslaughter, but the only logically permissible construction of section 192 was that "an unintentional homicide committed in the course of a noninherently dangerous felony may properly support a conviction of involuntary manslaughter, if that felony is committed without due caution and circumspection." (*Id*. at p. 835.) Otherwise, someone like the defendant who killed while committing a noninherently dangerous *felony* might be guilty of only battery, but another person who killed in the course of *lawful* but criminally negligent conduct would be guilty under section 192 of involuntary manslaughter. (*Id*. at p. 836.)

Here, defendant claims the evidence shows that Moran's killing occurred during the criminally negligent commission of a noninherently dangerous felony, the unlawful

19

possession of a sawed-off shotgun in violation of section 33215, and the trial court should have instructed on involuntary manslaughter based on that predicate act. Section 33215 prohibits a person from giving, lending, or possessing a short-barreled rifle or a short-barreled shotgun, with exceptions. The offense is a wobbler. Defendant asserts the offense is not an inherently dangerous felony. (See *People v. Satchell* (1971) 6 Cal.3d 28, 41-43, overruled on another ground in *People v. Flood* (1998) 18 Cal.4th 470, 484, 490, fn. 12.) He claims substantial evidence shows he committed the offense by constructively possessing the shotgun during the murder, as he had the ability to lend it and seek its return. (See *People v. Pena* (1999) 74 Cal.App.4th 1078, 1083-1084.) He also asserts the evidence shows that possessing and lending the gun to Carlos was criminally negligent, but it was not a consequence of malice.

The Attorney General raises several arguments in opposition. He acknowledges there was evidence the gun was a sawed-off shotgun and that defendant purchased it through a nonsanctioned gun dealer. But he claims there was no evidence that defendant's possession of the shotgun was " 'illegal.' "

The Attorney General also claims *Burroughs* did not suggest that any noninherently dangerous felony that the defendant may have committed at the time of the killing will support an involuntary manslaughter instruction regardless of whether the act of committing that felony caused the victim's death. There must be a showing that the death resulted from the criminally negligent commission of the felony.

Further, the Attorney General claims there was no substantial evidence on which the jury could conclude defendant committed the possession felony with only criminal negligence. The evidence showed that defendant's and Carlos's actions were intentional and deliberate, not criminally negligent.

We agree with the Attorney General's first point. Although defendant did not invite any error, he also did not proceed on a theory of homicide during a noninherently dangerous felony. He did not raise the theory or present any evidence affirmatively

20

establishing the possession was illegal and not exempt from the statutory bar. Thus, there was insufficient evidence on which the court could have reasonably based an instruction on involuntary manslaughter on its own initiative. While some of the relevant facts that would support defendant's theory may have surfaced at trial, the lack of any presentation and argument of the relevant facts in support of the defense rendered any possible instruction on it speculative.

The California Supreme Court faced this issue under similar circumstances in *People v. Wade* (1959) 53 Cal.2d 322, 334 (*Wade*), disapproved on another ground in *People v. Carpenter* (1997) 15 Cal.4th 312, 381-382. In *Wade*, the defendant, a felon, was convicted of first degree murder and attempted robbery following his shooting and killing the owner of a liquor store. (*Wade, supra*, 53 Cal.2d at pp. 326-328.) The trial court denied the defendant's request for an instruction on second degree murder. Then, during trial, the defendant did not advance a plausible theory of the facts to support a verdict of second degree murder even though the trial court had asked him to do so. (*Id*. at p. 333.)

On appeal, the defendant advanced for the first time a theory of second degree felony murder. He was a felon unlawfully in possession of a firearm at the time of the robbery and killing, and he argued the jury could have convicted him of second degree murder for the killing based on the commission of his possession felony. (*Wade, supra*, 53 Cal.2d at p. 333.) He claimed the trial court should have foreseen from the evidence that the new theory was applicable and should have instructed on the lesser-included offense on its own initiative. (*Id*. at pp. 333-334.)

The California Supreme Court disagreed. It stated that although the trial court had a duty to instruct sua sponte on the general principles of law governing the case, "the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly. The judge need not fill in every time a

21

litigant or his counsel fails to discover an abstruse but possible theory of the facts." (*Wade, supra*, 53 Cal.2d at p 334.)

The high court held that the trial court's not instructing on second degree murder was not error. It stated, "Defendant's theory of the case was not one that the evidence would strongly illuminate and place before the trial court. On the contrary, it was so far under the surface of the facts and theories apparently involved as to remain hidden from even the defendant until the case reached this court on appeal. The trial court need not, therefore, have recognized it and instructed the jury in accordance with it. Omniscience is not required of our trial courts." (*Wade, supra*, 53 Cal.2d at p. 335.)

The same reasoning applies here. The evidence did not illuminate or place the new theory before the court. The parties assumed defendant lent a sawed-off shotgun to Carlos, but neither side expounded upon nor argued from that assumption. At no time did defendant argue that the possession was unlawful, that defendant's lending it to Carlos was negligent, or that the murder occurred during the commission of a noninherently dangerous felony. Defendant thus would have us impose upon the trial court a duty to scour the record independently for facts that could support any possible theory that could lead to a defense. No such duty exists. Where the defendant cannot see the theory at trial, the trial court need not find it for him.

Even if defendant had introduced the theory at trial, the court would not have been required to instruct on it on its own initiative in this instance. A sua sponte instruction on a lesser included offense is required when the evidence that the defendant is guilty *only* of the lesser offense is substantial enough to merit consideration. (*People v. Sattiewhite, supra*, 59 Cal.4th at p. 477.) Substantial evidence in this context is evidence from which the jury could conclude that the lesser offense, but not the greater, was committed. (*Ibid*.) Here, the evidence was overwhelming that defendant gave Carlos the shotgun not merely with criminal negligence, but intentionally and with malicious intent. As we stated above, defendant gave Carlos the gun and ammunition knowing Carlos intended to

22

kill with it in order to end an argument.  When Carlos made his intent to kill explicit by telling defendant that anyone who acted dumb or stupid was "going to go down," defendant did not ask Carlos to return the gun.  Instead, he continued accompanying Carlos while holding his own gun.  Because there was no substantial evidence that defendant gave the gun to Carlos out of criminal negligence, the trial court was not required to instruct on its own initiative on involuntary manslaughter based on a noninherently dangerous felony.

D.    Inherently dangerous assaultive felony without malice.

To understand how a homicide committed during an inherently dangerous assaultive felony can be involuntary manslaughter, we must return to the California Supreme Court's jurisprudence on the felony murder rule.  As stated above, a nonmalice homicide occurring during the commission of an inherently dangerous felony generally may be prosecuted as murder under the felony murder rule.  If the predicate felony is one of the felonies listed in section 189, the offense is first degree murder.  (§ 189, subd. (a).)  If the predicate felony is an inherently dangerous felony that is not listed in section 189, the offense is second degree murder.  (§ 189, subd. (b).)

The Supreme Court has created an exception to the second degree felony murder rule "to ameliorate its perceived harshness."  (*People v. Chun* (2009) 45 Cal.4th 1172, 1188 (*Chun*).)  In *People v. Ireland* (1969) 70 Cal.2d 522 (*Ireland*), the court stated that applying the second degree felony murder rule to inherently dangerous felonies that are assaultive in character would extend the operation of the felony murder rule " 'beyond any rational function that it is designed to serve.' [Citation.]"  (*Id*. at p. 539.)  The court continued:  "To allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault--a category which includes the great majority of all homicides."  (*Ibid*.)  The court thus held that "a second degree felony-

23

murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included in fact within the offense charged." (*Ibid*., fn. omitted.)

The California Supreme Court clarified its *Ireland* ruling in *Chun*. Referring to the ruling as the "merger doctrine," the court explained that *Ireland's* exception to the felony murder rule "developed due to the understanding that the underlying felony must be an independent crime and not merely the killing itself. Thus, certain underlying felonies 'merge' with the homicide and cannot be used for purposes of felony murder." (*Chun, supra*, 45 Cal.4th at p. 1189.) The court held that "[w]hen the underlying felony is assaultive in nature, such as a violation of section 246 [shooting at an inhabited dwelling] or 246.3 [discharging firearm in grossly negligent manner], . . . the felony merges with the homicide and cannot be the basis of a felony-murder instruction. An 'assaultive' felony is one that involves a threat of immediate violent injury." (*Id*. at p. 1200.) Thus, where the homicide results from an inherently dangerous assaultive felony, the second degree felony murder rule does not apply, and the offense is murder only if the prosecution establishes that the defendant acted with malice aforethought.

In *People v. Bryant* (2013) 56 Cal.4th 959 (*Bryant*), the California Supreme Court asked, but did not directly answer, what offense occurred when a homicide resulting from an inherently dangerous assaultive felony was committed *without* malice if it was no longer second degree felony murder. (*Id*. at p. 966.) At a minimum, the offense was not *voluntary* manslaughter. In all offenses that constitute voluntary manslaughter, the defendant has acted with an intent to kill or a conscious disregard for life. (*Id*. at p. 970.) The court did not reach the issue of whether a nonmalice killing resulting from an inherently dangerous assaultive felony constituted involuntary manslaughter, as the court of appeal had not considered it. (*Id*. at pp. 970-971.)

However, in *Brothers, supra*, 236 Cal.App.4th 24, the court of appeal reached the issue and held that, under *Bryant's* logic, such a homicide constituted involuntary

24

manslaughter. "[I]f an unlawful killing in the course of an inherently dangerous assaultive felony without malice must be manslaughter [citation] and the offense is not voluntary manslaughter (*Bryant, supra*, 56 Cal.4th at p. 970), the necessary implication of the majority's decision in *Bryant* is that the offense is involuntary manslaughter. Accordingly, an instruction on involuntary manslaughter as a lesser included offense must be given when a rational jury could entertain a reasonable doubt that an unlawful killing was accomplished with implied malice during the course of an inherently dangerous assaultive felony." (*Brothers, supra*, 236 Cal.App.4th at pp. 33-34.)

Defendant does not concede that the evidence supports a finding that he aided and abetted an aggravated assault. But, assuming for argument that the evidence supports that finding, defendant contends the evidence of him harboring implied malice was weak, and, without expressly saying so, he wants us to imply from this that the trial court should have instructed on involuntary manslaughter under *Brothers*, as the predicate act was an inherently dangerous assaultive felony.

In opposition, the Attorney General contends the overwhelming evidence shows that defendant harbored express and implied malice. He argues that because the evidence left no room for reasonable doubt that defendant acted with malice aforethought, the trial court was under no obligation to instruct on involuntary manslaughter under *Brothers*.

We agree with the Attorney General. As we just explained, the evidence that defendant acted with malice aforethought was overwhelming. As a result, the trial court was not required to instruct on involuntary manslaughter based on an inherently dangerous assaultive felony.

E.     Felonious assault

Defendant attempts to argue a new ground for supporting an instruction on involuntary manslaughter, but the argument merely restates the holding in *Brothers* that a killing that occurs during an assault with a deadly weapon is involuntary manslaughter

25

unless the defendant acted with malice aforethought. Defendant bases his argument on Justice Kennard's concurrence in *Bryant*. In her concurrence, Justice Kennard sought to answer the question the *Bryant* majority chose not to address: whether a killing from an assault with a deadly weapon constituted involuntary manslaughter. (*Bryant, supra*, 56 Cal.4th at p. 971 [conc. opn. of Kennard, J.].)

Justice Kennard addressed that question in light of section 192's definition of involuntary manslaughter as a killing that takes place "in the commission of an unlawful act, *not amounting to a felony*." (§ 192, subd (b), italics added.) She analyzed whether the Legislature, through this wording, intended "to preclude a conviction for involuntary manslaughter when the killing happens during any unlawful act that *is* a felony[.]" (*Bryant, supra*, 56 Cal.4th at p. 972, fn. omitted.)

The justice found that the phase "not amounting to felony" in common law was used to distinguish involuntary manslaughter from felony murder. (*Bryant, supra*, 56 Cal.4th at pp. 972-973.) "Thus," she reasoned, "when the 1872 Legislature defined involuntary manslaughter in section 192 as a killing occurring 'in the commission of an unlawful act, not amounting to felony,' it must have meant that a killing during an unlawful act is involuntary manslaughter *unless* the unlawful act is the type of felony that turns the killing into the greater crime of murder." (*Id*. at p. 973.)

Defendant cites the quoted language to assert a separate ground for involuntary manslaughter. But the justice noted that felonies that turn a killing into murder were those listed in section 189 and inherently dangerous nonassaultive felonies that supported second degree felony murder under *Chun*. Assault with a deadly weapon was an inherently dangerous felony, but because it was not listed in section 189 and because it was an assaultive felony, a homicide resulting from an assault with a deadly weapon had to be involuntary manslaughter unless malice aforethought was established. (*Bryant, supra*, 56 Cal.4th at pp. 973-974.)

Justice Kennard thus did not establish that a "felonious assault," by itself, constituted involuntary manslaughter. She simply reached the same conclusion reached in *Brothers*, that if the assault was inherently dangerous and constituted an assaultive felony, the crime was involuntary manslaughter unless malice aforethought was established. And we have already addressed the *Brothers* holding and rejected its application in this matter.

F.      Harmless error

Even were we to conclude that the trial court erred by not instructing on involuntary manslaughter, we would find the error harmless. "[I]n a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v.*] *Watson* [(1956) 46 Cal.2d 818]. A conviction of the charged offense may be reversed in consequence of this form of error only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred (*Watson*, *supra*, 46 Cal.2d 818, 836)." (*People v. Breverman* (1998) 19 Cal.4th 142, 178, fn. omitted.)

We cannot make that finding here. The evidence of defendant's culpability as aider and abettor is overwhelming. He knew Carlos wanted the shotgun to look for the person with whom he had argued. He knew Carlos previously ended an argument by shooting the person in the face. Knowing this, he gave Carlos the gun and ammunition. He could not have done much more to facilitate the murder than that. But he did more. He went with Carlos to find the person while holding his own handgun. When Carlos announced that if anyone starts acting dumb or stupid, they would be "going down," defendant did not retreat or ask for his gun back. Instead, he continued with Carlos. When they found Moran and Gonzalez, defendant was holding his gun in view of

27

Gonzalez. He retrieved his shotgun later that day when Carlos returned it. He asked no questions about Carlos's actions, likely because he had none. He had known what Carlos would do, and he facilitated it with the same intent.

Moreover, contrary to defendant's argument here, the jury was not given an all-or-nothing choice between convict of first degree murder or acquit. The court had also instructed the jury on aiding and abetting second degree murder. Thus, if the jury had determined that defendant did not commit murder with express malice, it had another option besides acquittal. Had the evidence merited, it could have determined defendant acted with implied malice and found him guilty of second degree murder. The fact that the jury with this option nonetheless determined that defendant acted willfully, deliberately and with premeditation indicates the jury would have reached the same conclusion had it also been instructed on nonmalice involuntary manslaughter. Therefore, any error in not instructing on that crime was harmless.

Defendant contends the instructional error violated his federal constitutional rights and we must review the error under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705]. He claims the California Supreme Court has not yet determined whether failing to instruct sua sponte on lesser included offenses violated federal due process. That is incorrect. As we stated above, the Supreme Court has clearly stated that in a noncapital case, we review for error under the state *Watson* standard, not the federal standard. (*Breverman, supra*, 19 Cal.4th at p. 178.)

Defendant also contends that if we find no error, his trial counsel rendered ineffective assistance for not requesting an instruction on involuntary manslaughter. We disagree for the same reason we hold that any error was harmless. There was no prejudice.

To establish ineffective assistance of counsel, defendant must prove that (1) his trial counsel's representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficiency resulted in

28

prejudice to defendant. (*Maury, supra,* 30 Cal.4th at p. 389; *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674].) If defendant makes an insufficient showing on either of those components, his ineffective assistance claim fails. (*People v. Holt* (1997) 15 Cal.4th 619, 703; *Strickland v. Washington*, *supra*, 466 U.S. at p. 687.)

Defendant must affirmatively prove prejudice to establish ineffective assistance. (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) "[T]he record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*Maury, supra,* 30 Cal.4th at p. 389.) Defendant must show a reasonable probability of a more favorable result. (*People v. Ledesma* (1987) 43 Cal.3d 171, 217-218; *Strickland v. Washington, supra*, 466 U.S. at pp. 693-694.)

As we have already set forth, defendant is unable to establish that the omission of an involuntary manslaughter instruction was prejudicial. Thus, his claim of ineffective assistance fails.

III

*Admission of Uncharged Offense Evidence*

Defendant contends the trial court abused its discretion and violated his right to due process when it admitted evidence of the Torres shooting under Evidence Code section 1101, subdivision (b) to establish defendant's knowledge of Carlos's intent at the time of Moran's murder. He asserts the evidence was not relevant and that its probative value was outweighed by its prejudicial impact as it did not establish that defendant knew Carlos was planning a murder.

A. <u>Background</u>

The trial court first determined the purposes for which the evidence of the Torres shooting was not admissible. The evidence could not be admitted to show defendant's

intent, as nothing indicated that defendant had intended anything to happen to Torres. The evidence could not be admitted to show defendant's motive. His involvement in the Torres shooting did not establish he had a similar motive in the Moran shooting. The evidence also could not be admitted to show a common plan or scheme. Defendant did not commit or participate in killing Torres, so how it happened could not be part of defendant's plan.

The trial court, however, concluded the evidence of the Torres shooting could be admitted to show defendant's knowledge at the time of the Moran murder. Framing the issue before it, the court stated, "So, the question I'm focusing on is the knowledge aspect of [Evidence Code section] 1101(b). What did Mr. Ibarra know about the codefendant's intent, because the codefendant is the perpetrator. The key is on first-degree premeditated murder. Did the . . . defendant . . . know . . . what [Carlos] was going to do."

The court first determined that evidence of the Torres shooting was relevant for purposes other than showing defendant's character. It stated, "Mr. Ibarra's knowledge of the unlawful purpose of a perpetrator, and knowing the purpose of the perpetrator is relevant. In fact that is the issue in this case. All the other evidence can be proved. The only issue in Mr. Ibarra's case, that I see, is it first, second, or some other type of act. Was it first-degree murder or second-degree murder."

Next, the court determined that evidence of the Torres shooting was relevant to the issue of defendant's knowledge. It stated, "Does it go to an issue of consequence. . . . Yes, this is the key question in the case. We have defendant's statements. He admits to everything except of what his knowledge of what the perpetrator was going to do. Does this evidence help the issue in question? Yes. It shows that Mr. Ibarra -- it depends on how you argue it -- had knowledge that when [Carlos] asked him for the gun, and he gave him the gun, and they went together to confront the victim, that he was going to shoot the victim because he had done it before. Mr. Ibarra admits [Carlos] shoots somebody else

30

before in an argument less than three months ago. He saw him shoot somebody else in the face."

The court continued, "Now, I struggled with this. This wasn't an easy -- this·isn't easy. But for Mr., you know, Ibarra to hide behind that and say, well, I didn't know what the perpetrator was going to do. I don't know if -- there is truth in evidence, because he just saw him shoot somebody else for an argument with a gun in the face. So that's highly relevant for the jury to use in deciding whether it was first, second, or some other kind of murder on the aider and abettor's part."

The trial court found that sufficient evidence existed to show the Torres shooting actually happened. Gonzales had stated the facts and defendant had admitted to it in his statement. Moreover, less than three months transpired between the shootings. The evidence was relevant to showing defendant was an aider and abettor in part because it showed his relationship with Carlos and their conduct before and after the offense. From its analysis, the court concluded the evidence of the Torres shooting was relevant and admissible to establish knowledge.

At this point, the court analyzed the evidence under Evidence Code section 352 for undue prejudice. Stating the evidence was prejudicial without expressly finding the evidence was unduly prejudicial, the court set out to limit the evidence's prejudicial impact. Because the evidence was being admitted only to show what defendant knew from witnessing the Torres shooting, the court stated it would exclude all other evidence about that shooting which defendant had not personally known or witnessed at the scene. Under this ruling, the court would exclude the fact that Torres died from the shooting, the 911 calls, first responder evidence, and the autopsy report. The court concluded that the evidence, so limited, was not unduly prejudicial, and it admitted the evidence solely on the issue of defendant's knowledge.

Later, the court explained its analysis on admitting the evidence to establish defendant's knowledge and its effect on showing defendant's intent. It reminded the

parties that the prosecution had to establish that defendant aided or encouraged the commission of the murder with knowledge of Carlos's unlawful purpose and that defendant harbored the intent or purpose of committing, encouraging, or facilitating the murder's commission. The court continued, "And I just wanted to go back to this intent issue. So the knowledge and intent are kind of encapsulated, that's why when I first started ruling out stuff, I said bear with me on the intent part. Do you see the difference? It's not for the intent that he harbored a certain intent on one occasion, so he's harboring the same intent on another. It's coming in for the knowledge of the perpetrator, and then it does weigh in on his intent in that way."

B.    Analysis

Defendant contends the trial court abused its discretion by admitting evidence of the Torres shooting. He asserts the evidence was irrelevant. He claims that at best, the evidence showed only that he knew a natural and probable consequence of accompanying Carlos in an armed assault could be murder -- an aiding and abetting theory not advanced by the prosecution -- not that he knew Carlos intended to kill. He further argues that admitting the evidence was unduly prejudicial and violated his constitutional right to due process.

"Evidence that a person committed a crime is admissible when it is relevant to prove a material fact other than the person's disposition to commit an act. (Evid. Code, § 1101, subd. (b).) The evidence may be used to establish a person's knowledge as well as motive, opportunity, intent, preparation, plan, identity, and the absence of mistake or accident. (*Ibid.*)

"The California Supreme Court has explained 'that "[t]he admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence." (*People v. Carpenter,*[*supra,*] 15 Cal.4th

32

[at pp.] 378-379.) The main policy that may require exclusion of the evidence is the familiar one stated in Evidence Code section 352: Evidence may be excluded if its prejudicial effect substantially outweighs its probative value. Because substantial prejudice is inherent in the case of uncharged offenses, such evidence is admissible only if it has substantial probative value. ([*People v.*] *Ewoldt* [(1994)] 7 Cal.4th [380,] 404.) This determination lies within the discretion of the trial court. (*People v. Carpenter, supra*, at p. 380.)' (*People v. Kelly* (2007) 42 Cal.4th 763, 783.)

" 'To be admissible, there must be some degree of similarity between the charged crime and the other crime, but the degree of similarity depends on the purpose for which the evidence was presented.' (*People v. Jones* (2011) 51 Cal.4th 346, 371.) This court has held that '[w]hether similarity is required to prove knowledge and the degree of similarity required depends on the specific knowledge at issue and whether the prior experience tends to prove the knowledge defendant is said to have had in mind at the time of the crime.' (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 241 []).)

"In some cases, only a general similarity may be required, because the knowledge at issue can be derived from different experiences." (*People v. Felix* (2019) 41 Cal.App.5th 177, 184-185.)

Applying this analysis, we conclude the trial court did not abuse its discretion by admitting evidence of the Torres shooting. The evidence was material, sufficiently similar and probative, and its probative value outweighed its prejudicial impact.

The evidence of defendant's witnessing Carlos shoot Torres was material and probative. As discussed above, to convict defendant as an aider and abettor to premediated murder, the prosecution had to establish that defendant knew that Carlos intended to kill. Evidence of the Torres shooting was relevant to establishing that defendant knew that Carlos harbored the intent to kill when he asked for defendant's shotgun to settle an argument. The facts of the Torres shooting were sufficiently similar to the circumstances of the Moran shooting. In both shootings, defendant ended an

33

argument by shooting his opponent at close range in a manner which demonstrated an intent to kill.  Moreover, Carlos shot Torres only three months before he shot Moran.  The similarity of the circumstances and the short time separating the two shootings supported the inference that defendant, having witnessed Carlos shoot Torres with the intent to kill to end an argument, harbored the same knowledge about Carlos's intentions when Carlos asked for the gun to settle his dispute with Moran.

The probative value of the evidence of the Torres shooting outweighed its prejudicial impact.  We recognize that evidence of uncharged misconduct " ' "is so prejudicial that its admission requires extremely careful analysis" ' and to be admissible, such evidence ' "must not contravene other policies limiting admission, such as those contained in Evidence Code section 352." ' ([*Ewoldt, supra*,] 7 Cal.4th [at p.] 404.)  Thus, '[t]he probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury.' (*People v. Kipp* [(1998)] 18 Cal.4th [349,] 371.)"  (*People v. Lewis* (2001) 25 Cal.4th 610, 637.)

The evidence's probative value was high.  In his statements to police, defendant admitted each element of being an aider and abettor to Moran's murder except for knowing that Carlos intended to kill Moran.  Evidence of defendant's witnessing the Torres shooting helped establish defendant's knowledge of Carlos's intent the day he shot Moran.  As stated above, on the day of the murder, Carlos told defendant he was looking for someone he had argued with and he needed the shotgun.  Defendant received this request knowing that Carlos had ended an argument three months earlier by shooting his opponent in the face.  Defendant gave Carlos the shotgun and some ammunition, and then he accompanied defendant to the slough carrying his own handgun.  At the slough, Carlos told defendant that if anyone "starts acting like a dumb shit or stupid shit, they're going to go down."  Upon hearing Carlos's express intent, defendant did not change course.

34

Defendant's knowledge of the Torres shooting along with his giving Carlos the gun and ammunition and hearing Carlos's statement of intent, established that defendant knew that Carlos intended to kill.

The evidence's probative value outweighed its prejudicial impact. The prejudice referred to in Evidence Code section 352 applies to evidence that "uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." (*People v. Felix* (1994) 23 Cal.App.4th 1385, 1396.) Evidence that a codefendant in defendant's presence previously shot a person in the face can evoke the type of emotional bias section 352 was intended to prevent. However, in this case, the evidence was highly probative. It went to a key issue in the case. It was not duplicative, and nothing in the record indicates the evidence confused the issues, mislead the jury, or required an undue amount of trial time to be presented. Moreover, the court limited the evidence's prejudicial impact by admitting only evidence of the shooting which defendant saw or knew at the time of the event. As a result, evidence that Torres died from the shooting, the 911 calls, first responder evidence, and the autopsy report were not admitted.

The court further negated the evidence's prejudicial impact by instructing the jury with CALCRIM No. 375. This instruction allowed the jury to consider evidence of the Torres shooting only for the limited purpose of defendant's knowledge at the time of the murder. The jury could not conclude from the evidence that defendant had a bad character or was disposed to commit crime. The jury also could not use the evidence by itself to prove defendant was guilty of murder. The prosecution had to prove each element of the crime beyond a reasonable doubt. We presume the jurors understood and followed this instruction, as no evidence in the record indicates otherwise. (*People v. Holt, supra,* 15 Cal.4th at p. 662.)

Under these circumstances, we cannot say the trial court abused its discretion or committed constitutional error by admitting the evidence of the Torres shooting.

35

Accordingly, we do not reach defendant's arguments of prejudicial error under state and federal standards.

## IV

### *Cumulative Error*

Defendant asserts that the combination of errors, though independently harmless, cumulatively constituted prejudicial error. Because we have found no error, there can be no cumulative error. "[C]laims previously rejected on their substantive merits--i.e., this court found no legal error--cannot logically be used to support a cumulative error claim because we have already found there was no error to cumulate." (*In re Reno* (2012) 55 Cal.4th 428, 483.)

### DISPOSITION

The judgment is affirmed.

_____
HULL, Acting P. J.

We concur:

_____
MURRAY, J.

_____
RENNER, J.